UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEREK L. BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01257-JMS-DML |
| | ) | |
| LARA DEATON, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION TO APPOINT COUNSEL, AND DIRECTING ENTRY OF FINAL JUDGMENT**

This action is based on Derek Boyd's allegations that Nurse Lora Deaton[1] unreasonably denied him medical and mental health treatment in 2018 at the Tipton County Jail. In this entry, the Court denies Mr. Boyd's most recent motion to appoint counsel, grants Nurse Deaton's motion for summary judgment, and directs that this action be dismissed and final judgment entered.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.

---

[1] The **clerk is directed** to correct the spelling of Nurse Deaton's first name on the docket from "Lara" to "Lora."

Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before it. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 572–

73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II. Scope of Action

Mr. Boyd's original and amended complaints featured a host of claims, most of which were dismissed for failure to state a claim upon which relief may be granted. All stemmed from Mr. Boyd's allegations that another inmate told him to "suck [his] dick" in May 2018 and that Mr. Boyd responded by kneeing that inmate in the face.

At screening, the Court identified only one plausible claim for relief:

> The action shall proceed with Fourteenth Amendment claims against Nurse Lara Deaton pursuant to 42 U.S.C. § 1983. These claims shall be based on the allegations that Nurse Deaton unreasonably denied Mr. Boyd mental health treatment and medical treatment for a hernia following his incident with the other inmate and then again unreasonably denied him medical treatment after he was scalded in the shower on July 21, 2018.

Dkt. 22 at 4. The Court offered Mr. Boyd an opportunity to call its attention to additional claims it may have overlooked. *Id.* In response, he attempted only to add claims unrelated to Nurse Deaton's medical and mental health care. *See* dkt. 27.

Mr. Boyd's response to Nurse Deaton's summary judgment motion is similarly wide-ranging. Nurse Deaton's approach to Mr. Boyd's medical and mental health in 2018 remain the only relevant issues. And because Mr. Boyd's claims proceed under § 1983, only Nurse Deaton's conduct is at issue. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly."); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.") (internal quotation omitted).

3

The Court considers only evidence and arguments related to the reasonableness of Nurse Deaton's decisions and actions in treating Mr. Boyd's medical and mental health conditions. Unrelated evidence and arguments have been ignored.[2]

### III. Facts

Nurse Deaton was a nurse at the Jail during Mr. Boyd's incarceration there. She was employed by Quality Correctional Care, a third-party contractor. Dkt. 65-1 at ¶ 2. She did not work at the Jail every day. Nurse Deaton reviewed inmates' requests, assessed their conditions, and relayed information to physicians or physicians' assistants (PAs), who could make diagnoses and order specific treatments. *Id.* at ¶ 4.

Mr. Boyd arrived at the Jail in late March 2018. Dkt. 65-2 at 2. This was not his first stint at the Jail. In February 2017, Nurse Deaton saw Mr. Boyd at the Jail and documented that he had a small, umbilical hernia, which he said had bothered him for two years. *Id.* at 23. It is not clear when Mr. Boyd was released in 2017.

Mr. Boyd returned as a pretrial detainee in March 2018 and was scheduled for a fourteen-day health assessment with Nurse Deaton on April 10, which the Court understands to be an initial assessment of his health upon arrival. *Id.* at 2–3. Of particular relevance to this action, the assessment form called for an examination of Mr. Boyd's abdomen and inquiries into any history

---

[2] These include Mr. Boyd's frequent invocations of the Health Insurance Portability and Accountability Act (HIPAA) and Prison Rape Elimination Act (PREA). The Court did not identify plausible HIPAA or PREA claims at screening. And, in any event, Mr. Boyd has no claim against Nurse Deaton under either statute. *See Stewart v. Parkview Hosp.*, 940 F.3d 1013, 1015 (7th Cir. 2019) ("HIPAA confers no private right of action."); *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015) ("PREA does not establish a private cause of action for allegations of prison rape," and "any claim raised under the PREA is properly dismissed as frivolous."); *Closson v. Kohlhepp*, No. 1:21-cv-00772-TWP-DML, 2021 WL 3363139, at *2 (S.D. Ind. Aug. 3, 2021) ("Any claim based on [PREA] or failure to comply with its guidelines are dismissed because the PREA does not create a private right of action.").

4

of hernia, mental health conditions, and victimization. *Id.* But Mr. Boyd's health records reflect that he refused to engage in the assessment. *Id.*

Mr. Boyd's incident with the other inmate occurred on May 21, 2018. Dkt. 17 at ¶ 10 (verified amended complaint). There is no evidence, however, that Nurse Deaton learned of the incident or any impact of it on Mr. Boyd for nearly a month.

On June 16, 2018, Mr. Boyd completed an "Inmate Request for Medical, Dental, or Mental Health Services." Dkt. 65-2 at 22. Mr. Boyd checked only the "Mental Health" box at the top of the form. *Id.* He wrote, "I was sexually harrassed and almost sexually assaulted. It is very painful and the Jail isnt taking this seriously. I was denied the right to call P.R.E.A. for a month almost. I feel so alone." *Id.* (errors in original). A different staff member received the request on June 17. *Id.* The following day, Nurse Deaton reviewed the request, noted she would be at the Jail on June 19, and said she would see him then. *Id.*

Notes from the June 19 visit indicate that Mr. Boyd informed Nurse Deaton of the May 21 incident and told her he felt that he was endangered in his housing assignment and believed the other inmate should have been punished. *Id.* at 21. He also requested referral for a prostate exam. *Id.* Nurse Deaton's notes indicate that she referred Mr. Boyd for treatment by a mental health professional and for a prostate exam. *Id.* at 21 –22.

On June 21—two days after he met with Nurse Deaton—Mr. Boyd submitted another request. He wrote, "The umbelical hernia feels like its knotted and I may require an emergency surgery to prevent death." *Id.* at 20 (errors in original). The very next day, Mr. Boyd submitted a request for mental health care. *Id.* at 19. He wrote:

> The Jail officer Ryan Musson is mocking my sexual harassment P.R.E. case, he keeps bringing up sexual harassment and remind me of issue's I have recieved no help or treatment from. It make's me not want to reach out for help and I feel like I am going to get in trouble for nothing. He keep's threatening write up's.

5

*Id.* (errors in original). Nurse Deaton's notes indicate that she received and reviewed both requests on June 22, that Mr. Boyd refused to meet with her, and that she again referred him for treatment by a mental health professional. *Id.* at 19–20.

> On June 23, Mr. Boyd submitted a request for mental health treatment that stated:
>
> I am getting made fun of for filing a P.R.E.A. complaint by the sergeant Ryan Musson. He is intimidating and tall and keeps saying that's sexual harrassment or saying that's a write up. He opened my legal mail and invaded my private attorney/client relationship. I feel like I should have just performed the sexual request asked by Chris Burt. I need to talk to a mental health provider.

*Id.* at 18 (errors in original). Nurse Deaton's notes indicate that she received this request on June 26 and referred Mr. Boyd for treatment by a mental health professional. *Id.*

On June 26, Nurse Deaton also examined Mr. Boyd concerning his complaints of a hernia. *Id.* at 17. She noted a bulge near Mr. Boyd's naval but documented that she was "[u]nable to palpitate anything that feels like it is protruding From abdominal cavity." *Id.* (errors in original). Her notes conveyed that Mr. Boyd should be referred for further examination by a doctor or PA. *Id.*

Mr. Boyd complained of his hernia again in medical requests dated June 27 and 28. On June 27, he stated that the pain had "gotten worse" and felt like his intestine was "knotted." *Id.* at 15. He stated he was in pain "all the time." *Id.* On June 28, Mr. Boyd described his pain as "getting untolerable." *Id.* at 16. He complained that Nurse Deaton did not prescribe Tylenol, aspirin, "or any pain relief medicine." *Id.* Nurse Deaton responded to these requests on June 28 and 29, respectively. *Id.* at 15–16. She noted that Mr. Boyd was scheduled to see the doctor or PA the next time one visited the Jail and that Mr. Boyd was free to purchase over-the-counter pain medicine through the commissary until then. *Id.* Nurse Deaton also asked the staff member who relayed Mr. Boyd's requests to document Mr. Boyd's current activity levels and abilities. *Id.*

6

Mr. Boyd met with a mental health professional on June 28—twelve days after submitting his original request. *Id.* at 13–14. She noted "maladaptive behavior" and that Mr. Boyd reported anxiety, but she also noted that Mr. Boyd denied any intent of harming himself or any history of suicide attempts. *Id.* Her notes also indicate that Mr. Boyd inquired about the availability of medication to treat his anxiety and attention deficit hyperactivity disorder. *Id.*

On July 17, a PA evaluated Mr. Boyd's hernia. *Id.* at 12. He found a "small," "reduceable" umbilical hernia and called for an ultrasound to determine whether surgery was appropriate. *Id.*

On July 20, Mr. Boyd submitted his first medical care request in about three weeks. He wrote:

> This hernia tore or ripped a lot worse in a fight on 5-21-2018 in this Jail. I am being denied treatment and told the Jail wont pay for surgery when it's not my fault I was sexually harassed and had to fight off a sexual predator, in turn injuring myself and making the Jail responsible to get the injury fixed.

*Id.* at 11 (errors in original). Nurse Deaton responded the same day that Mr. Boyd was scheduled for an ultrasound. *Id.*

Mr. Boyd was burned by hot water in the shower on July 21. He submitted a medical request at 1:45 A.M. on July 22, writing:

> The severe burns I suffered tonight at 7:58 pm at the Jail are very painful. The fact nothing was done to relieve pain or reduce damage to my skin is very disturbing. This is improper medical care and abuse. There are picture's and video of the Burn's. No treatment was given at all.

*Id.* at 10 (errors in original). Nurse Deaton responded at 5:14 A.M. that Mr. Boyd could receive Tylenol twice per day and that she would examine him the next time she was at the Jail. *Id.*

It is not clear when Nurse Deaton learned of Mr. Boyd's burns. Mr. Boyd alleges that an e-mail was sent to her at 8:50 P.M. on July 21. Dkt. 73 at ¶ 15. However, that message is not in the record. Moreover, Mr. Boyd does not articulate how he knows when the e-mail was sent, and he provides no evidence clarifying when it was received. Nurse Deaton states that she received an e-

7

mail with pictures showing "mild redness" on Mr. Boyd's legs and back but determined that pain medication was an appropriate treatment because there were no signs of blisters, bruising, or open wounds. *Id.* at ¶¶ 17, 27.

Mr. Boyd underwent his ultrasound on July 24, and it showed a likely omental fat hernia. Dkt. 65-2 at 6. Nurse Deaton offered to examine his burns afterward, but Mr. Boytd refused. Dkt. 65-2 at 8–9. Mr. Boyd was not allowed to eat before his ultrasound. *See id.* at 9. Later on July 24, he submitted a medical care request stating that he refused to meet with Nurse Deaton because he was "tired and weak from being denied food." *Id.* He added:

> Im also in pain since you stopped pain medication after 2 day's for burns on 12% of my body. I apologise and hopefully the burn's I have been denied medical treatment on don't scar bad Please reschedual.

*Id.* (errors in original). The basis for Mr. Boyd's "12%" figure is unclear.

Mr. Boyd states now that Nurse Deaton "falsified the document claiming" he refused to have his burns examined on July 24, but he does not address his medical request from July 24, which acknowledges that he refused to meet with her. *See* dkt. 73 at ¶ 16. Nurse Deaton's notes from July 24 indicate that he did not complain of pain when he lay down for the ultrasound. Dkt. 65-2 at 8.

Mr. Boyd refused another nurse visit on July 26. Dkt. 65-2 at 7. On August 2, he met with a different nurse, who noted that Mr. Boyd primarily complained that about the quality of medical care he had received so far at the Jail. *Id.* at 5. She noted that she would refer his records, including the ultrasound report, for a second opinion regarding the necessity of surgery. *Id.* at 5.

Mr. Boyd was transferred to a different jail on August 6, 2018. *Id.* at 4. Nurse Deaton completed a review and summary of his medical records on August 7 and noted that the PA recommended that he be scheduled for an appointment with a surgeon before learning of the transfer. *Id.*

8

## IV. Analysis

A Fourteenth Amendment claim alleging inadequate medical care is "subject to an objective-unreasonableness standard." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). To prevail, the plaintiff must "make a twofold showing." *Id.* "First, he must show that the defendant acted purposefully, knowingly, or recklessly when considering the consequences of [her] response to the medical condition at issue." *Id.* "Second, the plaintiff must show that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *Id.*

Mr. Boyd alleges that Nurse Deaton violated his Fourteenth Amendment rights by responding unreasonably to his hernia, his mental health concerns, and his burns. However, the evidence available would not allow a reasonable jury to decide any of these claims in his favor.

**A.     Hernia**

Nurse Deaton first learned of Mr. Boyd's hernia at least as early as February 2017, but he then left the Jail. When Mr. Boyd returned in March 2018, he refused to participate in an initial assessment. Assuming for the sake of argument that Nurse Deaton remembered Mr. Boyd and his hernia, his refusal to undergo an initial assessment deprived her of any opportunity to examine the hernia or receive an update from Mr. Boyd about his current condition.

Mr. Boyd alleges that he aggravated his hernia during the May 21 encounter and that Nurse Deaton prevented him from receiving treatment for it for 53 days. Dkt. 73 at 5. However, no evidence indicates that Nurse Deaton learned of the May 21 altercation until Mr. Boyd submitted his mental health care request on June 16, and there is no evidence that she learned about any worsening of Mr. Boyd's hernia until he submitted a medical request on June 21. Indeed, Nurse Deaton met with Mr. Boyd on June 19 regarding his mental health care request, and her notes

9

indicate that he complained about his prostate, but they include no reference to his hernia. *See* dkt. 65-2 at 21.

Mr. Boyd's medical records indicate that Nurse Deaton offered to examine him on June 22—the day after he submitted the first medical request complaining of his hernia—but he again refused. Dkt. 65-2 at 20. Mr. Boyd provides no evidence to the contrary. Mr. Boyd agreed to meet with Nurse Deaton four days later, on June 26. That day, Nurse Deaton examined Mr. Boyd and referred him for further examination by a physician or PA. *Id.* at 17.

That examination took place on July 17. *Id.* at 12. In between, Mr. Boyd submitted medical care requests concerning his hernia on June 27 and 28. In response, Nurse Deaton noted that Mr. Boyd was scheduled to see the PA and that, in the meantime, he could obtain pain relievers from the commissary. *Id.* at 15–16. No evidence indicates that Nurse Deaton delayed Mr. Boyd's meeting with the PA or that she could have done anything to expedite it. No evidence indicates that Mr. Boyd's condition—a small, painful hernia—was so grave that any reasonable nurse would have sent him to the hospital or taken other, more immediate action. And no evidence indicates that Nurse Deaton knew or should have known that Mr. Boyd lacked the means to purchase pain relievers as she suggested.

On July 19, after Mr. Boyd met with the PA, Nurse Deaton scheduled him for an ultrasound, which took place five days later. Dkt. 65-2 at 6, 12. In between, Mr. Boyd submitted one medical request concerning his hernia, and Nurse Deaton responded that he was scheduled for an ultrasound. *Id.* at 11. Mr. Boyd left the Jail two weeks after the ultrasound. There is no evidence that Nurse Deaton could have done anything to expedite Mr. Boyd's hernia treatment following the ultrasound but before his departure from the Jail.

No reasonable trier of fact could find that this timeline reflects objectively unreasonable conduct by Nurse Deaton.

The Constitution did not demand that Nurse Deaton read Mr. Boyd's mind. She could only care for his hernia once she knew it was a problem. *See James*, 959 F.3d at 317 (Plaintiff "must show that the defendant acted purposefully, knowingly, or recklessly."). Given Mr. Boyd's refusal to meet with her in April, she could not have known that Mr. Boyd's hernia had worsened until she received his first written complaint on June 21.

Even then, Nurse Deaton could not diagnose Mr. Boyd's hernia and operate on it herself. The record indicates she did everything she could do under the circumstances: offer promptly to examine Mr. Boyd; persist when he refused her initial offer; and promptly arrange for the next medical professionals up the chain to take the next, appropriate step.[3]

In a perfect world, a person who knew about the incident on May 21 would have arranged for an immediate medical examination, and a doctor would have been available to see Mr. Boyd or review his records more promptly. But the Constitution demands only reasonableness—not perfection—in this arena. Moreover, Nurse Deaton can only be liable for her own actions or errors, *see Colbert*, 851 F.3d at 657, and all the evidence indicates that she acted reasonably in treating Mr. Boyd's hernia.

---

[3] *See James*, 959 F.3d at 318–19 ("James contends that Hale unreasonably delayed his receipt of the antibiotic, but the record shows otherwise. No evidence suggests that Hale was aware of Dr. Kraemer's recommendation before the morning of February 23. And she immediately contacted a doctor to fill the prescription."); *Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020) ("Turner presented no evidence that would allow the trier of fact to conclude that the allegedly unreasonable conduct of any of the named defendants caused his surgery to be delayed. The unrebutted evidence showed that none of the defendants had the authority to schedule or to perform the relevant surgery. Additionally, the evidence shows that each time any of the individual defendants encountered Turner, his surgery or another appointment was on the plastic surgery schedule. As a result, a reasonable jury could not conclude that the defendants' conduct was objectively unreasonable.").

B.  **Mental Health**

Mr. Boyd's mental health treatment claims follow a similar path. No evidence indicates that Nurse Deaton learned of the May 21 altercation before Mr. Boyd submitted his June 16 request for mental health treatment. Dkt. 65-2 at 22. She met with Mr. Boyd on June 19, the first day she was at the Jail after learning of the request, and referred Mr. Boyd for treatment by a mental health professional. *Id.* at 21–22. Mr. Boyd submitted another mental health care request on June 22, and Nurse Deaton offered to meet with him again—but he refused, and she again referred him for treatment by a mental health professional. *Id.* at 19–20. Mr. Boyd submitted another request the next day, and Nurse Deaton again promptly documented a referral. *Id.* at 18. Mr. Boyd met with a mental health professional on June 28—only twelve days after submitting his original request. *Id.* at 13–14. He did not submit additional requests for mental health treatment before being transferred from the Jail on August 6.

Again, in a perfect world, a member of the Jail staff might have informed Nurse Deaton of the May 21 altercation sooner. But no evidence reflects that Nurse Deaton knew about the incident or any trauma Mr. Boyd suffered from it until after Mr. Boyd submitted his June 16 request. She is not a mental health professional, and no evidence indicates that she could have done more than she did under the circumstances: promptly refer Mr. Boyd to a professional capable of providing the treatment he requested. No trier of fact could find this response objectively unreasonable.

C.  **Burns**

Finally, all available evidence indicates that Nurse Deaton responded reasonably upon learning that Mr. Boyd was burned in the shower. Nurse Deaton responded to Mr. Boyd's medical request at 5:14 the morning after he was burned, and no evidence supports an inference that she knew of Mr. Boyd's burns significantly earlier than she sent that response.

12

Nurse Deaton's response was that Mr. Boyd should take Tylenol to treat his pain based on the fact that pictures showed only redness and not blisters, bruising, or open wounds. Dkt. 73 at ¶¶ 17, 27. There is no evidence that—at the time of her response—Nurse Deaton possessed any information indicating that Mr. Boyd's injuries were more serious and required hospitalization or more aggressive treatment. The same can be said of Mr. Boyd's medical request. Mr. Boyd reported that his burns were "very painful" but otherwise used his request to complain about his healthcare and call it abusive. Dkt. 65-2 at 10. He did not describe symptoms other than pain, and he did not suggest that more aggressive treatment than pain relief was necessary.

The record does not document that Mr. Boyd complained further regarding his burns before Nurse Deaton offered to examine him on June 24. Mr. Boyd admits that he refused that meeting because he was tired and weak from fasting for his ultrasound. Dkt. 65-2 at 9. Regardless of why Mr. Boyd refused the examination, Nurse Deaton could not have learned that his burns required more aggressive treatment if he did not let her examine him.

In summary, none of the evidence in the record supports an inference that Nurse Deaton had reason to believe that Mr. Boyd's burns were serious and required more immediate, aggressive treatment than she offered. As such, Nurse Deaton is entitled to summary judgment on this claim.

## V. Motion to Appoint Counsel

Before Nurse Deaton moved for summary judgment, Mr. Boyd filed four motions asking the Court to appoint counsel to represent him for the duration of this action. The Court denied the most recent of those motions on March 10, 2021, finding that Mr. Boyd's prolific and cogent filings in this and other cases demonstrated that he was capable of litigating independently. Dkt. 53 at 2.

In August, Mr. Boyd filed another motion requesting counsel. He noted that he "broke bones in his writing hand in April of 2021" and was having difficulty keeping up with all his

litigation because he could not "write properly without extreme pain." Dkt. 67 at ¶ 1. Days later, though, Mr. Boyd filed three separate responses to Nurse Deaton's summary judgment motion, totaling eleven handwritten pages. Dkts. 68, 69, 70. He also submitted a handwritten discovery motion in late August, despite the fact that discovery was closed, and filed two handwritten surreplies to Nurse Deaton's summary judgment motion. Dkts. 71, 73, 74. Most notably, Mr. Boyd never filed a motion for additional time to respond to the summary judgment motion to allow his hand to heal or obtain assistance.

Mr. Boyd's most recent motion for counsel also states that there was "complicated discovery and interrogatory [*sic*]needing professional assistance . . . because Defendants have not provided adequate responses." Dkt. 67 at ¶ 2. But Mr. Boyd filed this motion after discovery was closed and did not provide enough detail to allow the Court to conclude that he was unable to issue proper discovery requests while discovery was open or that he was prevented from obtaining discoverable evidence in response to proper requests.

In short, Mr. Boyd's submissions since his fifth motion to appoint counsel only reinforce the conclusion that he is well equipped to litigate pro se. The docket in this action—and particularly his summary judgment materials—show that he was able to gather evidence and respond to Nurse Deaton's arguments. Moreover, given the evidence of Nurse Deaton's prompt responses to Mr. Boyd's concerns, it is difficult to imagine a different outcome even if Mr. Boyd was represented.

### VI. Conclusion

The **clerk is directed** to correct the spelling of Nurse Deaton's first name on the docket from "Lara" to "Lora." Mr. Boyd's fifth motion to appoint counsel, dkt. [67], is **denied**. Nurse Deaton's motion for summary judgment, dkt. [63], is **granted**, and claims against her are

**dismissed with prejudice**. The **clerk is directed** to enter **final judgment** consistent with this entry and the entry screening Mr. Boyd's amended complaint, dkt. [22].

    **IT IS SO ORDERED.**

Date: 2/15/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

DEREK L. BOYD
273507
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com